# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Donovan v. County of Lake*, 2011 IL App (2d) 100390

---

| | |
|---|---|
| Appellate Court Caption | CHRISTOPHER DONOVAN, AMANDA DONOVAN, ROBERT COOPER, and MARY COOPER, Individually and on Behalf of All Persons Similarly Situated, Plaintiffs-Appellants, v. THE COUNTY OF LAKE, Defendant-Appellee. |
| District & No. | Second District<br>Docket No. 2–10–0390 |
| Filed | July 8, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action seeking to prevent defendant county from issuing revenue bonds repayable solely by customers of a water system for the costs of constructing a new system, the negligence count was barred by the *Moorman* doctrine, the county was shielded from liability by the Tort Immunity Act, plaintiffs forfeited their argument that the breach of contract count was improperly dismissed, and summary judgment was properly entered for defendants on counts alleging that the county was not authorized to charge the system's customers exclusively for the replacement, since the county had direct statutory authority to issue bonds payable solely by the system's customers. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 09–L–197; the Hon. Christopher C. Starck and the Hon. Mitchell L. Hoffman, Judges, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Howard Philip Levine, of DeAno & Scarry LLC, and Shawn M. Collins and Aaron W. Rapier, both of Collins Law Firm, P.C., and Patrick A. Salvi, of Salvi, Schostok & Pritchard P.C., of Waukegan, for appellants. |
|---|---|
| | Michael J. Waller, State's Attorney, of Waukegan (Daniel L. Jasica, Assistant State's Attorney, of counsel), and James C. Bakk, of Waukegan, for appellee. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion. Justices McLaren and Hutchinson concurred in the judgment and opinion. |

## OPINION

¶ 1     Plaintiffs, Christopher Donovan, Amanda Donovan, Robert Cooper, and Mary Cooper, residents of the Glennshire subdivision in the Village of Hawthorne Woods (Village), brought a class action against defendant, the County of Lake (County), seeking to prevent the County from issuing revenue bonds repayable solely by customers of the Hawthorne Woods-Glennshire (HWG) water system (water system), for the costs of constructing a new water system. Judge Christopher C. Starck granted the County's motion to dismiss counts I and II of plaintiffs' amended complaint and transferred the remaining counts to the court's chancery division. In the chancery division, Judge Mitchell L. Hoffman granted summary judgment in favor of the County on counts III and IV of plaintiffs' second amended complaint. For the following reasons, we affirm the orders of the trial court.

¶ 2                    I. FACTS
¶ 3                    A. Background
¶ 4     The water system was originally constructed between 1954 and 1962 and served 224 residences by delivering water from 20 shallow wells. Each well served less than 15 residences, which classified the system as a "non-community water supply" and therefore not subject to public water system standards. See 415 ILCS 5/3.145 (West 2008).

¶ 5     The wells in the water system have water distribution mains, or piping, measuring 1 1/2 to 2 inches in diameter and are located mainly in the back and front yards of private residences. Half of the water system was never under the Village's control and was acquired by the County in 1973 under an agreement to which the Village was not a party. In 1975, the Village contracted with the County for the County to take over the operation and ownership of the portion of the water system the Village controlled (contract hereinafter referred to as the 1975 contract).

¶ 6     In the 1975 contract, the County agreed to make any improvements to the water system

that were required by the Illinois Environmental Protection Agency (IEPA). It also provided that, for operating, maintaining, or paying debts for improvements to the water system, the County was authorized to charge individual customers rates as required. Further, the contract provided that "[t]he County will from time to time issue revenue bonds to expand and improve the water supply facilities. Said revenue bonds shall be retired by funds derived from the local system."

¶ 7    In operating the water system, the County sampled and tested the water monthly at each of the 20 wells and sent the results of those tests to the IEPA. Between September 2000 and August 2005, three test results showed coliform exceeding the maximum contaminant level.

¶ 8    In 2006, the County obtained a permit from the IEPA to install interim chlorination facilities for the water system. Those facilities were constructed and made operational before August 2006. On September 19, 2007, the County submitted to the Village for its approval engineering and design plans for an IEPA-compliant water system, along with an application for a Village permit to site the new water system's distribution piping in the Village's right-of-ways and public easements.

¶ 9    Since the Village had permitted a competing water supply system, Aqua Illinois, to be installed in the Village subsequent to the 1975 contract, in order for the new water system to be constructed, the Village required the County to: (1) connect the water system to the Aqua Illinois water system; and (2) obtain its new water supply by buying water in bulk from Aqua Illinois.

¶ 10    To fulfill the Village's requirements, the County negotiated a "Water Supply and Sales Agreement" with the Village and with Aqua Illinois. This contract was effective May 12, 2009 (the 2009 contract).

¶ 11    In the 2009 contract, the parties acknowledged that the 2009 contract was a supplement to the 1975 contract. The parties also acknowledged that the water system was not originally constructed to public water system standards and that the water system was at that time more than 50 years old. The parties noted that the IEPA had cited the water system for various violations of state drinking-water standards and that the Illinois Attorney General had filed against the County an enforcement action that sought the replacement of the water system with a state-code-compliant public water system (PWS).

¶ 12    Among other things, the 2009 contract provided for Village authorization of a surcharge to water system customers' water bills to retire subordinate revenue bonds issued by the County to fund the construction of the new water system.

¶ 13    Regarding the local funding for the construction of the new water system, the 2009 contract, paragraph 3(g)(2)(I), specifically provides:

"***Funding Mechanism for new HWG PWS.*** The Village acknowledges and agrees that the proposed County-issued subordinate revenue bonds, secured by a surcharge on the water bills to HWG area Customers, is an appropriate funding mechanism by which the County is authorized, under the terms of the 1975 Contract between the Village and County, to charge and collect from HWG area Customers, for the proposed new Code-compliant HWG PWS construction and related costs. The Village agrees that the County is authorized, upon issuance of said County subordinate revenue bonds, to charge and

-3-

collect from HWG area Customers, a surcharge on the water bills of HWG area Customers to retire said County-issued subordinate revenue bonds."

¶ 14    The construction permit for the new water system was issued on May 8, 2009, and identified the approved water supply distribution piping as "17,207 feet of 4-inch water main, 2,490 feet of 6-inch water main, 12,373 feet of 8-inch water main, and 1,885 feet of 10-inch water main." The replacement water system would be an entirely new, code-compliant public water system, with distribution piping located in public right-of-ways and easements.

¶ 15    The initial estimates for the cost of building the new water system ranged from $23,000 to $25,000 per water system residence/parcel. However, following approval of the 2009 contract and the County's subsequent bidding out of the project, the actual cost for constructing the new water system is $11,600 per residence/parcel.

¶ 16    Before fixing the amount of the revenue bonds to be issued to fund the construction of the new water system, the County provided notice to the water system customers of the $11,600-per-residence/parcel cost and offered the customers an opportunity to prepay that amount in a lump sum. Of the 227 parcels served by the water system, 144 customers prepaid the lump-sum amount.

¶ 17    For the 83 customers who had not prepaid, the County adopted and approved a subordinate revenue bond ordinance for the amount of $1,220,000, secured by a surcharge on those customers' water bills, to fund the remaining portion of the construction costs, and related projects, for the new water system. Sale of those subordinate revenue bonds closed on November 2, 2009, and the water system contractor was given a "Notice to Proceed" on November 3, 2009.

¶ 18    Plaintiffs' initial complaint was filed on February 25, 2009. Plaintiffs filed an amended complaint on June 2, 2009, and a second amended complaint on August 27, 2009.

¶ 19                    B. Plaintiffs' Complaint

¶ 20    In count I of the amended complaint, plaintiffs alleged a cause of action for negligence. Generally, plaintiffs alleged that the County was obligated to chlorinate the water system's groundwater and that, because the County failed to do so, excessive amounts of coliform were detected on at least three occasions reported to the IEPA between 2000 and 2005. Plaintiffs alleged that the County had duties to responsibly operate and maintain the water system and that the County breached its duties by failing to do the following: (1) chlorinate the water system; (2) provide safe, potable water; (3) repair or replace water mains with monies from an adequate capital improvements fund; (4) set aside reserves sufficient to fund necessary capital improvements; (5) responsibly operate the water system; (6) responsibly maintain the water system; (7) make improvements to the water system as required by the IEPA; and (8) otherwise operate the water system in a reasonable fashion so as not to cause damage to plaintiffs.

¶ 21    In their appellate brief, as support for their claim that the County was obligated to make improvements to the water system, plaintiffs cite to section 2 of the 1975 contract, entitled, "Obligations of the County." That section provides, in pertinent part:

"[T]he County agrees to take over operation and maintenance of the existing water system and make the necessary improvements to the water system as may be required by the Illinois E.P.A."

¶ 22 Plaintiffs claimed that the County's breaches of its duties proximately caused damages to plaintiffs. Plaintiffs alleged the following as damages:

"[C]osts incurred for bottled water and filtration. In addition, Plaintiffs and the Class has suffered and will continue to suffer property damages. Property values in the proposed class areas have been impacted by Defendant's negligence, and such negligence threatens to cause Plaintiffs and the Class at least $25,000 per home for the cost of replacing the Water System."

¶ 23 In count II of the amended complaint, plaintiffs alleged a cause of action for breach of contract, as third-party beneficiaries of the 1975 contract. Specifically, plaintiffs asserted that the County is required to properly operate and maintain the water system, that the County is required to make improvements to the water system as required by the IEPA, and that the County has failed to do both. Plaintiffs claimed unspecified damages resulting from these alleged breaches of contract.

¶ 24 With respect to the County's authority under the 1975 contract to issue revenue bonds to pay for the cost of construction of a new water system, in their brief's statement of facts, plaintiffs cite to section 6 of the 1975 contract, entitled "Expansion and Improvement of the County Water System." That section provides, in pertinent part:

"The County shall expand and improve these facilities when the need arises for expansion of the Lake County Water System within the Village of Hawthorne Woods. The County will from time to time issue revenue bonds to expand and improve the water supply facilities. Said revenue bonds shall be retired by funds derived from the System."

¶ 25 Plaintiffs allege that the water system does not require expansion within the Village. Instead, the water system requires replacement because the County did not operate and maintain the water system properly over time. Since section 6 does not apply, plaintiffs allege, the County does not have contractual authority to issue such revenue bonds.

¶ 26 In count III of the amended complaint, plaintiffs sought a declaratory judgment that the County is not authorized, by statute or under the terms of the 1975 contract, to charge the water system customers exclusively for the cost of replacing the water system.

¶ 27 Count IV, added in the second amended complaint, sought an injunction, premised on count III's claims that the County possessed no statutory authority, and no contractual authority under the 1975 contract, to charge the water system customers exclusively for the cost of replacing the water system. Plaintiffs alleged that the County had advised the water system customers that they had 30 days within which to pay a lump sum, alleged to be $23,000 per residence, that represented each customer's *pro rata* share of the cost to replace the water system. Plaintiffs contended that injunctive relief was appropriate and necessary to preserve the status quo.

¶ 28 Neither plaintiffs' amended complaint nor their second amended complaint acknowledged the 2009 contract.

¶ 29     Before plaintiffs filed their second amended complaint, defendants moved to dismiss counts I, II, and III of the amended complaint. On September 9, 2009, the trial court entered an order dismissing counts I and II of the amended complaint. With regard to count I, the court found that the negligence claims were barred by the *Moorman* doctrine (see *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982)) as well as section 2–201 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2–201 (West 2008). The trial court dismissed count II without prejudice and found that, if the breach-of-contract count were to be repled, it would have to be repled under the 2009 contract. Judge Starck then transferred the remaining counts to the chancery division.

¶ 30     On November 9, 2009, the County filed a motion to dismiss counts III and IV of the second amended complaint. See 735 ILCS 5/2–619(a)(9) (West 2008). By agreement of the parties, the motion to dismiss was treated by the trial court as a motion for summary judgment. See 735 ILCS 5/2–1005 (West 2008).

¶ 31     With regard to whether the County had statutory authority to issue the revenue bonds and to make them payable from the funds generated solely from the water system customers, the court found that the phrase "any waterworks properties" in section 5–15017 of the Counties Code was critical. 55 ILCS 5/5–15017 (West 2008). The court noted that the Counties Code defined the term "waterworks system" as a waterworks system in its entirety *or any integral part thereof*. See 55 ILCS 5/5–15002 (West 2008). Therefore, the court held that the Counties Code authorized the County to issue revenue bonds payable solely from a portion of the waterworks properties. See 55 ILCS 5/5–15017 (West 2008).

¶ 32     The trial court also found that the 2009 contract, together with the applicable terms of the 1975 contract, impliedly authorized the Village to share with the County the authority provided by section 11–139–8 of the Illinois Municipal Code, which thus authorized the County to issue bonds payable solely by the water system customers. See 65 ILCS 5/11–139–8 (West 2008). Accordingly, the trial court entered an order granting summary judgment to the County on both counts. Plaintiffs filed a motion to reconsider, which was denied.

¶ 33                                    II. ANALYSIS

¶ 34     We initially note that plaintiffs do not frame their issues on appeal with respect to the four counts raised in their complaints. However, for purposes of clarity we will address plaintiffs' arguments in the context of each count alleged in the complaint.

¶ 35                            A. Count I–Negligence

¶ 36     First, we will address whether the trial court erred in dismissing count I of plaintiffs' amended complaint when it held that the negligence claims were barred by the *Moorman* doctrine as well as section 2–201 of the Local Governmental and Governmental Employees Tort Immunity Act.

¶ 37     The County filed its motion to dismiss plaintiffs' amended complaint pursuant to section 2–619.1 of the Code of Civil Procedure (Code). 735 ILCS 5/2–619.1 (West 2008). In that

motion, the County argued that the complaint should be dismissed pursuant to sections 2–615 and 2–619 of the Code. Regardless of whether the court dismissed plaintiffs' complaint pursuant to section 2–615 or 2–619, or a combination of both sections pursuant to section 2–619.1, our standard of review is the same. We review the trial court's order of dismissal *de novo*. *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). In doing so, we will accept as true all well-pleaded factual allegations. *Morris v. Illinois Central R.R. Co.*, 382 Ill. App. 3d 884, 886 (2008).

¶ 38                               1. The *Moorman* Doctrine

¶ 39    In count I of the amended complaint, plaintiffs alleged that the County had duties to responsibly operate and maintain the water system and that the County breached its duties by failing to do the following: (1) chlorinate the water system; (2) provide safe, potable water; (3) repair or replace water mains with monies from an adequate capital improvements fund; (4) set aside reserves sufficient to fund necessary capital improvements; (5) responsibly operate the water system; (6) responsibly maintain the water system; (7) make improvements to the water system as required by the IEPA; and (8) otherwise operate the water system in a reasonable fashion so as not to cause damage to plaintiffs. Plaintiffs contended that the County's breaches of its duties proximately caused the following damages:

> "[C]osts incurred for bottled water and filtration. In addition, Plaintiffs and the Class has suffered and will continue to suffer property damages. Property values in the proposed class areas have been impacted by Defendant's negligence, and such negligence threatens to cause Plaintiffs and the Class at least $25,000 per home for the cost of replacing the Water System."

¶ 40    In dismissing count I, the trial court held that plaintiffs' alleged damages involved out-of-pocket expenses and market-value loss to real property, which are considered economic losses not recoverable under the *Moorman* doctrine.

¶ 41    On appeal, plaintiffs argue that the damages alleged in count I are not barred under the *Moorman* doctrine for the following reasons: (1) plaintiffs did not allege that the damages were caused by a defect in the water system itself, but instead they alleged that the County's conduct caused their damages; (2) the cost to repair or replace property that is damaged by a defendant's negligence is not solely economic loss; (3) the County's negligence caused the water in the system to be unfit for drinking, and that dangerous situation was sufficiently sudden and calamitous to be considered an exception to the *Moorman* doctrine; and (4) this case is analogous to *Village of Deerfield v. Commonwealth Edison Co.*, 399 Ill. App. 3d 84 (2009), where we found that the *Moorman* doctrine did not apply.

¶ 42    In *Moorman*, 91 Ill. 2d at 91, the Illinois Supreme Court held that a plaintiff cannot recover solely economic loss under a tort theory of negligence. In *Moorman*, "economic loss" was described as "damages for inadequate value, costs of repair and replacement, or consequential loss of profits–without any claim of personal injury or damage to other property." (Internal quotation marks omitted.) *Moorman*, 91 Ill. 2d at 82. Although the *Moorman* case involved products liability, our supreme court later applied the economic-loss rule to claims that services were performed negligently. See *Anderson Electric, Inc. v.*

*Ledbetter Erection Corp.*, 115 Ill. 2d 146, 153 (1986). In *Anderson*, the court held that a plaintiff seeking to recover purely economic losses due to the defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover in contract. *Anderson*, 115 Ill. 2d at 153.

¶ 43    The economic-loss rule applies even to plaintiffs who have incurred physical damage to their property if the damage is caused by disappointed commercial expectations, gradual deterioration, internal breakage, or other nonaccidental causes, rather than by a dangerous event. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 200 (1997). For damages to be recoverable in tort, the sudden, dangerous, or calamitous occurrence must still result in personal injury or property damage. Without injury to a plaintiff's person or property, a claim presents an economic loss not recoverable in tort. *In re Chicago Flood Litigation*, 176 Ill. 2d at 201.

¶ 44    Plaintiffs first argue that the *Moorman* doctrine should not apply here because they are claiming that the County's negligent conduct in failing to properly maintain the water system caused their damages, not that the water system itself was defective. Specifically, they point to the County's failure to chlorinate the water system, which caused excessive levels of coliform to be present in the water supply. As support for this contention, plaintiffs note that the plaintiff in *Moorman* alleged a defect in the storage tank itself, and therefore the court correctly held that the damages alleged were solely economic losses. Plaintiffs contrast *Moorman* to the instant case, where they have alleged that the damages were proximately caused by the County's operation and maintenance of the water system.

¶ 45    We are not persuaded by plaintiffs' reasoning. Four years after the supreme court rendered its decision in *Moorman*, it applied the economic-loss rule to claims that services were performed negligently. See *Anderson Electric, Inc.*, 115 Ill. 2d 146. The *Anderson* court also held that "[a] plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." *Anderson*, 115 Ill. 2d at 153.

¶ 46    Here, according to plaintiffs' allegations, the County was providing water service to plaintiffs pursuant to a contract with the Village. If plaintiffs' expectations regarding how the County performed that service were not met, then the *Moorman* doctrine clearly applies.

¶ 47    Next, plaintiffs contend that the cost to repair or replace property that is damaged by a defendant's negligence is not solely economic loss. As support for this contention, plaintiffs cite to *City of Oakbrook Terrace v. Hinsdale Sanitary District*, 172 Ill. App. 3d 653 (1988). In *Oakbrook Terrace*, this court held that damages to the city's streets resulting from the defendant's negligent installation of storm sewers were not solely economic losses. *Oakbrook Terrace*, 172 Ill. App. 3d at 661. Here, plaintiffs contend that their water supply was made unsafe by, *inter alia*, the County's refusal to chlorinate the water. Therefore, plaintiffs' assert, the compelled replacement of the water system is a direct result of the County's negligence, and the cost of replacing the water system is a recoverable damage, just as the cost to replace the streets was recoverable in Oakbrook Terrace.

¶ 48    We disagree with plaintiffs that *Oakbrook Terrace* can be likened to the instant case. Here, the cost to replace the water system cannot be compared to the cost to repair the city's

streets in *Oakbrook Terrace*. In *Oakbrook Terrace*, the damages to the city's streets were a direct result of the defendant's negligent installation of storm sewers. Here, however, even viewed in the light most favorable to plaintiffs, the factual allegations in plaintiffs' complaint indicate that the water system did not have to be completely replaced simply because the County did not chlorinate the water. Specifically, the complaint alleges that the water system did have chlorination facilities installed in 2006, almost three years before plaintiffs filed their initial complaint. Since even plaintiffs' factual allegations do not show a direct relationship between the County's failure to chlorinate prior to 2006 and the need for the more-than-50-year-old water system to be replaced, plaintiffs' argument is without merit.

¶ 49    Plaintiffs also claim that the County's negligence caused the water in the system to be unfit for drinking, which was a dangerous situation sufficiently sudden and calamitous to be considered an exception to the *Moorman* doctrine. As support for this contention, plaintiffs cite to *In re Chicago Flood Litigation*, 176 Ill. 2d 179, and *Muirfield Village-Vernon Hills, LLC v. K. Reinke, Jr., & Co.*, 349 Ill. App. 3d 178 (2004).

¶ 50    In *In re Chicago Flood Litigation*, our supreme court held that the plaintiffs were permitted to seek recovery for perishable inventory lost due to an interruption in electrical service caused by a flood. Based upon this holding, plaintiffs argue that "[b]y analogy, it is only logical that plaintiffs here be allowed to pursue their damages caused by unfit drinking water. Both electrical service and potable water are utilities of everyday life. When a defendant's negligence interrupts a utility, as in the *Chicago Flood Litigation*, or permits pollutants in one, as here, the suddenness or dangerousness of those occurrences distinguishes those plaintiffs' tort damages from other situations when merely economic loss result."

¶ 51    Plaintiffs' analysis is flawed. The court in *In re Chicago Flood Litigation* did not allow the plaintiffs to seek recovery for their lost perishable inventory because electricity was a "utility of everyday life," nor did the court hold that the loss of electricity was a sudden or dangerous event that constituted an exception to the *Moorman* doctrine. Instead, the court held that, to recover in negligence, there must be a showing of harm above and beyond disappointed expectations. *In re Chicago Flood Litigation*, 176 Ill. 2d at 201. The court specifically noted that the plaintiffs were not seeking damages for the loss of continuous electrical service, which was a disappointed commercial expectation. Instead, the plaintiffs were seeking damages for property loss, in the form of lost perishable inventory, as a result of a tortious event. The court held that such damages were above and beyond the plaintiffs' commercial expectation of continuous electrical service and that therefore those losses fell outside the definition of economic loss and were recoverable in tort. *In re Chicago Flood Litigation*, 176 Ill. 2d at 202. Here, plaintiffs have not alleged any actual property loss that was above and beyond their disappointed commercial expectations, and, therefore, *In re Chicago Flood Litigation* is not analogous to the instant case.

¶ 52    Plaintiffs also cite to *Muirfield* as support for their proposition that the County's failure to chlorinate the water in the water system prior to 2006 caused a dangerous situation that was sufficiently sudden and calamitous to be considered an exception to the *Moorman* doctrine.

¶ 53　　In *Muirfield*, an infestation of mold and bacteria in a new home was held to be a sudden and calamitous event so as to fall within the exception to the *Moorman* doctrine. The *Muirfield* court noted that, "[w]hen characterizing an event as sudden and calamitous[,] the focus is upon 'the suddenness of the *occurrence of an event*–the point when the injury occurs *** –where such occurrence causes personal injury or damage to property external to the defective product which exposes a party to an unreasonable risk of injury to himself or his property, rather than the suddenness or length of time within which the *defect or cause of the occurrence* develops *** and manifests itself in the sudden and calamitous occurrence.' " (Emphasis in original.) (Internal quotation marks omitted.) *Muirfield*, 349 Ill. App. 3d at 194 (quoting *American Xyrofin, Inc. v. Allis-Chalmers Corp.*, 230 Ill. App. 3d 662, 671 (1992)).

¶ 54　　The court then held that, although the mold and bacterial infestation grew gradually, the manifestation was sudden and calamitous, damaging the plaintiffs' personal property and causing them to flee their house or experience the likelihood of personal injury. *Muirfield*, 349 Ill. App. 3d at 194. In the instant case, there was no sudden or calamitous manifestation of an event. The alleged dangerous event, the unfit drinking water, manifested itself over a five-year period when the water tested high for coliform levels on three different occasions. This in no way can be considered a sudden or calamitous event, and therefore, the exception to the *Moorman* doctrine does not apply.

¶ 55　　Plaintiffs also argue that the instant case is similar to and should be controlled by *Village of Deerfield*. In *Village of Deerfield*, damage claims for perishable inventory lost during electric outages were allowed to proceed because the claims were for "other property." Plaintiffs argue that the spoiled food in *Village of Deerfield* is analogous to the unfit water in this case.

¶ 56　　We are not persuaded. The costs of bottled water and filtration, as well as impacted property values, are not "property" that plaintiffs possessed and that was ruined as a result of the County's negligence. Accordingly, *Village of Deerfield* is inapplicable to the instant case.

¶ 57　　For all these reasons, we hold that the trial court properly dismissed count I of the amended complaint because plaintiffs' alleged damages were barred by the *Moorman* doctrine.

¶ 58　　　　　　　　　　　　　　　　2. Tort Immunity

¶ 59　　Plaintiffs also argue that the trial court erred in ruling that section 2–201 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) barred count I of the amended complaint. See 745 ILCS 10/2–201 (West 2008). Plaintiffs argue that the County did not establish its defense under the Tort Immunity Act because some of the duties that were allegedly breached were not discretionary. Specifically, plaintiffs claim that the County was mandated by law to provide safe water and to chlorinate it. See 35 Ill. Adm. Code 601.101, 653.601 through 653.608 (2010).

¶ 60　　Section 2–201 of the Tort Immunity Act extends the most significant protection afforded to public employees under the Act. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003). That section provides:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2–201 (West 2008).

Our supreme court has defined the terms "discretionary" and "ministerial" as follows:

" '[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act.' " (Emphasis omitted.) *Van Meter*, 207 Ill. 2d at 371-72 (quoting *Synder v. Curran Township*, 167 Ill. 2d 466, 474 (1995)).

¶ 61 Since the immunities afforded to governmental entities operate as an affirmative defense, those entities bear the burden of properly raising and proving their immunity under the Tort Immunity Act. 745 ILCS 10/2–201 (West 2008); *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 44 (1998).

¶ 62 Here, although the County may have been legally mandated to chlorinate the water and to provide safe drinking water, our focus is the *manner* in which the County carried out, or failed to carry out, those duties. For example, as to plaintiffs' factual allegations relating to three IEPA reports of coliform violations between 2000 and 2005, each required the County to decide the appropriate means and method to repair the violation, *i.e.*, whether to install chlorination facilities on the existing site or to completely rebuild the water system, as well as how to fund the repair. Further, the majority of the allegations in the amended complaint relate to the required replacement of the water system and whether customers should bear the entire cost. Those allegations relate to how to replace a more-than-50-year-old water system and invoke discretionary decisions on the part of the County. See *In re Chicago Flood Litigation*, 176 Ill. 2d at 194 (a municipal corporation acts judicially, or exercises its discretion, when it selects and adopts a plan in the making of public improvements). Accordingly, we find that the County met its burden of establishing that count I should have been barred because the County was shielded from liability under section 2–201 of the Tort Immunity Act.

¶ 63                              B. Count II–Breach of Contract

¶ 64 Count II of the amended complaint was a cause of action for breach of contract. Specifically, plaintiffs alleged that, as third-party beneficiaries of the 1975 contract, they had a right to have the County properly operate and maintain the water system and make improvements in the water system as mandated by the IEPA. The trial court dismissed count II without prejudice and ruled that, if plaintiffs were to replead this count, they should do so under the 2009 contract. The record reflects that plaintiffs did not do so, and the dismissal was made with prejudice.

¶ 65 In their notice of appeal, plaintiffs sought reversal of: (1) the September 9, 2009, order dismissing counts I and II of plaintiffs' amended complaint; (2) the January 5, 2010, order granting the County summary judgment on counts III and IV of the second amended

complaint; and (3) the March 23, 2010, order denying plaintiffs' motion to reconsider the January 5, 2010, order. However, although in their brief's statement of facts, plaintiffs discuss count II's allegations and make various claims regarding certain sections of the 1975 contract, in the argument section they do not raise this issue or cite to any authority to support their argument that the trial court erred in dismissing this count. Accordingly, we find that plaintiffs have forfeited this argument on appeal. See *Kinkaid v. Ames Department Stores, Inc.*, 283 Ill. App. 3d 555, 570 (1996) (issues raised in a notice of appeal but not raised before the appellate court are forfeited).

¶ 66    Even if we were to ignore plaintiffs' forfeiture, it is clear that any lawsuit brought on a contract that has been modified, as the 1975 contract was modified by the 2009 contract, must be brought on the modified contract. *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 469 (2004) (when a contract is modified by a subsequent agreement, any lawsuit to enforce the agreement must be brought on the modified agreement and not on the original agreement). Therefore, the trial court did not err in dismissing this count for plaintiffs' failure to plead it under the 2009 contract.

¶ 67                                    C. Counts III and IV

¶ 68    Count III of the second amended complaint sought a declaration that the County was not authorized, by statute or under the terms of the 1975 contract, to charge the water system customers exclusively for the cost of replacing the water system. Count IV of the second amended complaint sought an injunction against the County premised upon plaintiffs' claims in count III.

¶ 69    In granting the County summary judgment on both counts, the court held that: (1) the Counties Code authorized the County to issue revenue bonds payable solely from a portion of the waterworks properties (55 ILCS 5/5–15017 (West 2008)); and (2) the 2009 contract, together with the applicable terms of the 1975 contract, impliedly authorized the Village to share with the County the authority provided by section 11–139–8 of the Illinois Municipal Code, which thus authorized the County to issue revenue bonds payable solely by the water system customers (65 ILCS 5/11–139–8 (West 2008)).

¶ 70    On appeal, plaintiffs argue that the trial court erred in granting summary judgment for the County on counts III and IV, because the Counties Code makes no provision for repayment of the revenue bonds by anything but the County's entire waterworks properties.

¶ 71    The cardinal rule of statutory construction requires courts to ascertain and give effect to the legislature's intent. The statutory language, given its plain and ordinary meaning, best indicates the legislature's intent. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332 (2008). When the statutory language is clear and unambiguous, a court must give effect to the statute's plain meaning. *People v. Benton*, 322 Ill. App. 3d 958, 960 (2001).

¶ 72    The term "waterworks system" is defined in the Counties Code as follows:

"Definitions. When used in this Division the term 'waterworks system' means and includes a waterworks system in its entirety, or any integral part thereof, including mains, hydrants, meters, valves, standpipes, storage tanks, pumps, tanks, intakes, wells, impounding reservoirs, machinery, purification plants, softening apparatus, and all other

elements useful in connection with a water supply or water distribution system." 55 ILCS 5/5–15002 (West 2008).

¶ 73 The County's authority to issue subordinate revenue bonds for water supply projects derives from section 5–15017 of the Counties Code. That statute provides, in pertinent part:

"Revenue bonds. In order to pay the cost of the construction, acquisition by condemnation, purchase or otherwise of *any waterworks properties*, or sewage facilities, or a combination thereof, or waste management facilities, as the case may be, and the improvement or extension from time to time thereof, *** the county board may issue and sell revenue bonds *payable solely from* the income and revenue derived from the operation of *the waterworks properties*, or sewage facilities, or a combination thereof, or waste management facilities, as the case may be ***." (Emphasis added.) 55 ILCS 5/5–15017 (West 2008).

¶ 74 Plaintiffs initially note that the County, as a non-home-rule unit of government, is bound by Dillon's rule and therefore possesses only those powers that are specifically conveyed by the constitution or by statute. See *Village of Sugar Grove v. Rich*, 347 Ill. App. 3d 689, 694 (2004). We agree that the County is bound by Dillon's rule.

¶ 75 We have reviewed the pertinent sections of the Counties Code and agree with the trial court that section 5–15017 authorizes the County to issue revenue bonds payable solely by the water system customers. In that section, the County is given the authority to issue revenue bonds payable solely from the income and revenue derived from the operation of "any waterworks properties" in order to pay the cost of the construction of any waterworks properties. 55 ILCS 5/5–15017 (West 2008). The definition section of the Counties Code defines "waterworks system" as including a "waterworks system in its entirety, *or any integral part thereof*." (Emphasis added.) 55 ILCS 5/5–15002 (West 2008). We need not look outside the terms of those sections to determine the legislature's intent to authorize the County to issue revenue bonds payable by only the people being served by that particular water system. See *Beecher Medical Center, Inc. v. Turnock*, 207 Ill. App. 3d 751, 754 (1990) (a fundamental rule of statutory construction requires that, when an act defines its own terms, those terms must be construed according to the act's definitions).

¶ 76 For these reasons, we find that the trial court properly granted summary judgment to the County on counts III and IV of the second amended complaint. Since we have ruled that the County had direct statutory authority to issue revenue bonds payable solely by the water system customers, we need not address plaintiffs' argument that the trial court also erred in ruling that the 2009 contract, together with the applicable terms of the 1975 contract, impliedly authorized the Village to share with the County the authority provided by section 11–139–8 of the Illinois Municipal Code, which thus authorized the County to issue revenue bonds payable solely by the water system customers (65 ILCS 5/11–139–8 (West 2008)).

¶ 77                                III. CONCLUSION

¶ 78 Accordingly, we affirm the judgment of the trial court dismissing counts I and II of plaintiffs' amended complaint. We also affirm the judgment of the trial court granting the County summary judgment on counts III and IV of the second amended complaint.

¶ 79    The judgments of the circuit court of Lake County are affirmed.

¶ 80    Affirmed.