# Illinois Official Reports

## Appellate Court

*Nichols v. City of Chicago Heights*, 2015 IL App (1st) 122994

| | |
|---|---|
| Appellate Court Caption | CHARLOTTE NICHOLS, RODGER BOLDEN, RAUL TENIENTE, CARMEN TENIENTE, JUANITA DIXON, MICHAEL FOSTER, LINCOLN HAMILTON, KAREN HAMILTON, MICHAEL IFLAND, SUSAN IFLAND and CAMILLE WILLIAMS, on Behalf of Themselves and on Behalf of All Others Similarly Situated, a Proposed Class Action, Plaintiffs-Appellants, v. THE CITY OF CHICAGO HEIGHTS, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-2994 |
| Filed | April 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CH-3803; the Hon. Thomas Allen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | William J. Sneckenberg, of Sneckenberg, Thompson & Brody, LLP, of Chicago, and David R. Dubin, of Macuga, Liddle & Dubin, P.C., of Detroit, Michigan, for appellants.<br><br>Thomas G. Gardiner, Barry C. Owen, and Kyle P. Carson, all of Gardiner Koch Weisberg & Wrona, of Chicago, for appellee. |

| Panel | PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion. |
|---|---|
| | Justices Howse and Cobbs concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs Charlotte Nichols, Rodger Bolden, Raul Teniente, Carmen Teniente, Juanita Dixon, Michael Foster, Lincoln Hamilton, Karen Hamilton, Michael Ifland, Susan Ifland, and Camille Williams are a group of individuals[1] whose homes were damaged in flooding during a two-day rainstorm in April 2006. Heavy rainfall occurred on April 16-17, 2006 (the occurrence period) and sewer water containing pollutants, feces, dirt, debris, and other noxious matter from the sewerage system overflowed into plaintiffs' homes located in Chicago Heights. Plaintiffs brought suit against defendant City of Chicago Heights (the City), arguing that the City is responsible for the damage to their homes. Plaintiffs' second amended complaint asserted two claims against the City: (1) operational negligence; and (2) negligence under the doctrine of *res ipsa loquitur*. Following substantial hearings, discovery, depositions, and motions filed, the City filed a motion for summary judgment pursuant to section 2-1005 of the Code of Civil Procedure (735 ILCS 5/2-1005 (West 2010)), arguing it was immune from suit under the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/2-201 (West 2008)) (Tort Immunity Act or Act). The City supported its motion in part with an affidavit by Michael A. Sabo. Plaintiffs filed a motion to strike the Sabo affidavit. After hearing arguments on the motions, the trial court denied the motion to strike the Sabo affidavit and granted summary judgment in favor of the City. Plaintiffs appeal the trial court's ruling that the City of Chicago Heights is immune from the claims of negligence related to the maintenance and operation of its sewer systems and its subsequent grant of summary judgment in favor of the City of Chicago Heights. Plaintiffs contend that summary judgment was granted in error because: (1) the City was not entitled to discretionary immunity where the plaintiffs' claims arose from the City's ministerial act of maintaining its sewer system, rather than from a discretionary act; and (2) there was sufficient evidence to establish genuine issues of material fact regarding plaintiffs' negligence claim under the theory of *res ipsa loquitur*. In addition, plaintiffs contend the trial court erred in denying their motion to strike the Sabo affidavit. For the following reasons, we affirm.

---

[1]Plaintiffs have not been certified as a class.

- 2 -

On April 16-17, 2006, a rainstorm hit the Chicago area.[3] Plaintiffs allege that their homes, all located in the City of Chicago Heights, flooded with raw sewage as a result of this rainfall. Following the rainfall, the basements of approximately 5% of Chicago Heights residents allegedly flooded.

The City of Chicago Heights owns, maintains, and operates a separated sewer system in which storm water and sanitary wastewater travel in separate lines and to different end points.

Plaintiffs filed their original complaint against Chicago Heights in February 2007, alleging negligence, trespass, and nuisance, and seeking class action certification as a result of the flooding. In April 2007, plaintiffs filed an amended complaint alleging various claims, including trespass, nuisance, *res ipsa* negligence, operational negligence, negligent design, and unconstitutional taking. Several of these claims were dismissed. In August 2008, plaintiffs filed their second amended complaint alleging claims for maintenance and operational negligence, as well as *res ipsa loquitur* negligence. This is the complaint at issue here.

The record on appeal includes a September 13, 2005, letter written from Anthony DeLuca, mayor of the City of Chicago Heights, to James L. Daugherty, district manager of Thorn Creek Basin Sanitary District. The letter describes the efforts the City was making in the maintenance and operation of the sewer system. It states:

"RE: TCBSD Infiltration/Inflow Limits Ordinance

Dear Mr. Daugherty:

The purpose of this letter is to present our proposed I/I compliance schedule as requested by your March 7, 2005 letter.

Since submitting a similar compliance schedule in 1993, the City of Chicago Heights has actively pursued sanitary sewer rehabilitation efforts over the past decade. From 1994-97, the City also performed 2,705 manhole inspections (100% city-wide), dye water flood tested 137 high priority locations in 1995, and conducted a city-wide house-to-house survey of 8,302 buildings (91%).

In the mid-1990s, the City obtained a $3.2 million low interest loan from IEPA that funded over 500 manhole repairs, 1,678 vertical feet of manhole lining, 50-sewer point repairs, and cured-in-place lining of 47,451' of sewer mains in the northwest area of the

---

[2]At the outset, we note that plaintiffs' appellate brief contains violations of supreme court rules. Illinois Supreme Court Rule 341(h) (eff. Feb. 6, 2013) requires the appellant to include a statement of facts containing the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment. The statement of facts presented in plaintiffs' appellate brief, however, is replete with comment and argument. For example, on page 7, plaintiffs state, "[i]f the City had properly maintained its sewer system, the destruction of Plaintiffs' homes and properties would never have occurred." On page 8, in a discussion of City policy regarding sewer maintenance and inspection, plaintiffs baldly state, "[t]he origins of and basis for this policy are a mystery." We caution plaintiffs to be mindful of the rules that have been established in order to provide meaningful and expeditious review of issues presented on appeal. See, *e.g.*, *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 494 (2002).

[3]The parties disagree as to the magnitude of the storm. Plaintiffs contend that the storm "was considered to be between a 10-year 15-hour and 25-year 15-hour rainfall event." Defendant contends the storm was "torrential," "historic," and "within the range of a 100-year rain event." Both parties agree that it was a heavy rain, which is sufficient for our purposes here.

City. Subsequently in 1996-97, the City performed an additional 9 point repairs, 144 manhole repairs, and 12,600' of sewer lining throughout the Saratoga Farms and Bradley Terrace subdivisions. Since 1997, the City has invested an additional $1,100,000 toward 31,300' of additional sewer lining. These efforts have greatly reduced I/I entering the sanitary sewer system. The building surveys and manhole inspections referenced above identified approximately 7.5 MGD of I/I that remains in the City's system. Manhole rehabilitation is generally found to be cost-effective due to the relatively low repair cost and significant I/I reductions achieved, and it is estimated that repairing all defective manholes in the City would cost approximately $2,500,000. The manhole rehabilitation work is known and proposed to be completed in a multi-year program as budget constraints allow. We also intend to perform flow monitoring at strategic locations to isolate subareas containing high I/I concentrations, additional dye flood testing and sewer televising in these high flow subareas, and associated rehabilitation work identified by these investigations. It is estimated that the investigative work will cost $150,000 City-wide.

The City's current budget includes the repayment of the $3.2 million loan to IEPA through the year 2016 from sewer fees collected from users. Therefore, available funds for sewer rehabilitation efforts during the next decade will remain similar to the past several years ($250,000/yr) until the loan debt is serviced.

Therefore, the following compliance schedule is proposed:

[2006 to 2014 year-by-year proposed spending on items such as flow monitoring and sewer televising, manhole rehabilitation, and sewer lining, with a total estimated cost of $3,250,000.]

We are confident that our continued commitment to significant investments into rehabilitating our sewer system infrastructure will result in the City's compliance with the District's I/I limits over time, and look forward to working with the District toward achieving this goal.

At this time Robinson Engineering has prepared a full set of manhole rehabilitation plans for the entire City. After the compliance schedule is agreed upon we subdivide the plans to meet the financial constraints of the yearly budget. After your approval of the plans and specifications we will be able to immediately go to bid for the manhole rehabilitation project."

¶ 7    The record on appeal also includes the October 2011 affidavit of Michael A. Sabo. This affidavit reads in its entirety:

"I, Michael A. Sabo, after first being duly sworn on oath, depose and state that if I were sworn as a witness I could competently testify to the following:

1. I am over the age of eighteen and make this affidavit of my own personal knowledge.

2. I am a resident of Chicago Heights, Illinois.

3. Between 1999 and 2007, I was Alderman of the 6th District of Chicago Heights, with an office at 1601 Chicago Road, Chicago Heights, IL 60411.

4. Between 2007 and 2009, I was the Director of City Services and Projects for the City of Chicago Heights.

5. Since 2009, I've been the Director [of] Street, Sewer, and Vehicle Maintenance Departments for the City of Chicago Heights.

6. Between 2004 and 2007, the City of Chicago Heights' legislation was enacted in the form of ordinances passed by a majority vote of the City Council.

7. Until 2011, the City Council comprised the mayor and six aldermen. A seventh alderman was added in 2011.

8. The City of Chicago Heights owns, maintains and operates a separated sewer system in which storm water and sanitary wastewater travel in separate lines and to different end points.

9. The storm water that enters the City's storm sewer system is discharged in local waterways.

10. The wastewater that enters the City's sanitary sewers from the homes of City residents and businesses travels through the City's system to Thorn Creek Basin Sanitary District where it is treated before being discharged into local waterways.

11. Thorn Creek has the ability to regulate the amount of wastewater that flows from the City's sanitary sewer system into the Thorn Creek Treatment plant.

12. If for any reason the flow from the City's sewer system into the Thorn Creek facility was stopped or slowed, this could cause the City's system to backup and result in backups in the homes and businesses of City residents.

13. The City of Chicago Heights Municipal Code places the responsibility for the installation, connection and maintenance of sewer lines that connect to the City's system upon the City's residents and businesses.

14. A blockage in a City resident's lateral lines could and often does cause sewage backups into the resident's home and/or the backup of sewage into other residents' homes.

15. The City Council adopted as the standard for operations and maintenance of its municipal sewer systems to have a system that can handle events involving less than a 50 year storm.

16. The Mayor and City Council were aware that the City's sewer system was in need of repair in March 1993.

17. The Chicago Heights City Council alone has the authority to allocate funds for and initiate a plan to maintain, repair and/or upgrade the City's sewer system.

18. In 1993, following notification of the City's violation of a Thorn Creek ordinance, the City Council voted on a sewer rehabilitation program.

19. The purpose of the sewer rehabilitation plan initiated in 1993 was to upgrade the City's sewer system and bring Chicago Heights into compliance with Thorn Creek ordinances.

20. In March 1993, the City Council voted to authorize over $1,100,000 in private sector and public sector investigations to isolate and identify sources of infiltration and inflow into its sanitary sewer system.

21. Between 1994 and 1997, this investigation phase included dye water flood testing of 137 high priority locations, 2,705 manhole inspections, a house-to-house survey, with internal and external inspections of 8,302 buildings in Chicago Heights–(91% of all buildings in the city).

22. Beginning in 1997, the City began its initial phase of sewer rehabilitation, comprising over a $1,000,000 in rehabilitation work, funded in part by a $3.2 million low interest loan from the Illinois Environmental Protection Agency.

23. The above projects required the city to retire its debt at a rate of $220,000 annually.

24. After 1997, 31,300 additional feet of sewer lining were deployed.

25. In 2005, the City Council made the policy decision, in full cooperation with Thorn Creek, that the work required to bring the sewer system into compliance with infiltration limits would be completed in 2015.

26. All determinations with respect to the prioritization of sewer system rehabilitation and upgrades discussed above were made prior to April 16-17, 2006.

27. The type of flooding that Plaintiffs' allege they suffered in this case can occur in the homes of Chicago Heights' residents as a result of an obstruction in the sanitary sewer system despite the City's regular maintenance and inspection of the system.

28. The March 3, 2006 letter from Chicago Heights Mayor to Thorn Creek Basin Sanitary District attached hereto as Exhibit A, is a true and correct copy of said letter, and said letter was made in the regular course of business, and it was the regular course of business to make such a memorandum or record at the time of such an event or within a reasonable time thereafter. This letter is maintained as a regular business record by the City of Chicago Heights Street, Sewer, and Vehicle Maintenance Department of which I am Director.

29. Before any repair, maintenance or upgrade project can begin, the City Council must allocate funding for the project, and, in doing so, consider the overall needs and safety of City residents and allocate budgetary resources accordingly."

¶ 8 Also included in the record on appeal is a letter from the City of Chicago Heights mayor Anthony DeLuca to James L. Daugherty, district manager for the Thorn Creek Basin Sanitary District, dated March 3, 2006. It reads, in pertinent part:

"RE: [Thorn Creek Basin Sanitary District] Infiltration/Inflow Limits Ordinance

Dear Mr. Daugherty,

The purpose of this letter is to respond to your December 28th, 2005 letter requesting the City of Chicago Heights to submit a revised sewer rehabilitation Compliance Schedule. A revised schedule providing recommendations for system rehabilitation to achieve compliance with Thorn Creek Basin Sanitary District (TCBSD) Ordinance No. 328 is enclosed. The intended plan is to serve as an expansion of our current rehabilitation program by outlining tasks and budget assignments designed to bring the system into compliance. The schedule includes system investigations and systematic rehabilitation designed to remove, isolate and pinpoint Inflow/Infiltration (I/I) sources throughout the City's sanitary sewer transport system.

To remind the District just how committed the City is to transport system improvements, we will summarize our efforts, to date. Since formal notification of its noncompliance with TCBSD ordinance in March 1993, the City of Chicago Heights has authorized over $1,100,000 in private sector and public sector investigations to isolate and identify sources of infiltration and inflow into its sanitary sewer system. Since 1997 the City has performed over a $1,000,000 in rehabilitation work. As part of

- 6 -

our initial phase of sewer rehabilitation, the City (funded by a $3.2 million low interest loan from the Illinois Environmental Protection Agency), completed several sewer improvements on the City's northwest side in 1997. It is important for the District to recognize the City is retiring the debt for the 1997 improvements at a rate of $220,000 annually. The remaining debt retirement period exceeds the 10-year rehabilitation program suggested by the District. The work performed is listed below:

## Work performed between 1996-1997

### Bradley Terrace

Approximately 4,100 lineal feet of pipelining,

5 point repairs, and

33 manhole repairs

### Saratoga Farms and its tributaries

8,500 lineal feet of sanitary sewer lining

4 point repairs

111 manhole repairs

### Manhole Inspections 1994-1997

2,705 sanitary sewer manholes–100% of all known manholes within the City

Dye Water Flood Testing (spring 1995)

A total of 137 high priority locations were tested by National Power Rodding Corporation

### House-to-house survey

A citywide building-to-building survey was conducted from 1994 to 1997, and consisted of internal and external inspections of 8,302 of the 9,123 buildings (91%) existing in the City. Survey crews were unable to gain entry into 821 buildings (9%). Of the 9,123 buildings, a total of 6,812 buildings, or 75%, are suspected to contain at least one type of connection contributing I/I to the sanitary sewer system. A summary of the investigation is described below.

Detailed in a May 1997 report prepared by Robinson Engineering, Ltd., estimated that a total of 5.706 MGD I/I is contributed to the City's sanitary sewer system from private property sources.

### Work performed after 1997

31,300 lineal feet of sanitary sewer lining

2 point repairs

The above work resulted in over $1,100,000 in public sector rehabilitation repairs to reduce infiltration and inflow into its sanitary sewer system. These efforts have greatly reduced I/I entering the sanitary sewer system.

The rehabilitation of all defects found in the entire system is almost never cost-effective. In any system, however, some rehabilitation is always cost-effective. The system costs for most sewage collection and treatment systems of any significant size depend upon its capacity, or the flow it can handle. The desirable extent of rehabilitation can only be determined objectively by economic and practical considerations. We are committed to the rehabilitation program and have reviewed

Baxter & Woodman's first year recommendations listed in its November 7, 2005 letter to the District. We have therefore, revised our program accordingly.

**Sewer System Inventory and Mapping:**

A newly computerized base map and sewer system atlas will be developed. We intend to include storm sewers on the initial mapping. The initial impact to update the City's sanitary sewer atlas and incorporate all system data into a Geographic Information System database would allow data to be linked into the updated map which would assist the City in developing a long term I/I reduction program.

**Flow Monitoring:**

Attached is a map containing the major sewer service areas in Chicago Heights. The map identifies 6 major trunk sewers where we propose to monitor flow rates for a 3-month period. These initial data will be used to determine the location of where to install flow meters for the next round of flow monitoring. If the monitoring locations selected on the attached map are not to the District's liking, please advise where you would like us to measure.

**Sewer Televising and Cleaning**

Based on initial flow monitoring results, areas will be selected for televising and cleaning. Plans and specifications will be prepared for the work and bid out. The result will identify were sewer rehabilitation is recommended. A report summarizing our findings will be prepared.

**Progress Report:**

An engineering report will be prepared identifying worst areas for further investigation. A compliance schedule for further investigation will be prepared. Preliminary cost estimates for the work and a financial needs analysis will be included.

Based on the first year investigations, the rehabilitation scope, probable project costs, funding needs, allocations and long-term program to maintain the City's sanitary sewer system would be determined. Attached is a project schedule outlining work-flow. The cost for the first year program is outlined in Table 2 below.

**Table 2 Compliance Schedule–Year One (2006)**

| Proposed Schedule | Budget |
|---|---|
| Flow monitoring 6 locations | $25,000 |
| Internal Television Inspection | $90,000 |
| GIS Mapping | $130,000 |
| Engineering Report | $35,000 |
| Debt Service Payment | $220,000 |

| Total | $500,000 |
|-------|----------|
|       |          |

The City intends to adopt and implement this plan for I/I reduction to reduce wastewater treatment operating cost, maximize collection system hydraulic capacity, and meet TCBSN requirements. Once the initial investigation and evaluation are complete, the City will address its user charge program to determine if additional revenue is needed to implement rehabilitation projects per your recommendations in order to come into compliance within the I/I limits by 2015.

The priorities for maintenance activities have been revised to reflect District directives within the current sewer user charge system. It is recognized that flexibility in implementation will be necessary due to the ever-changing circumstances common with municipal infrastructure systems and budgets.

If you have any questions concerning this matter, please feel free to contact the undersigned.

s/ Anthony DeLuca, Mayor"

¶ 9 The record on appeal also includes an invoice from Robinson Engineering to "City of Chicago Heights, Mayor and City Council," dated April 13, 2006, regarding "2006 Sewer Maintenance–Flow Monitoring." It reflects "services performed" through March 31, 2006 as: "perform flow monitoring, prepare proposal for sewer cleaning, review sewer cleaning proposals, meeting with Chicago Heights staff and TCBSD." The invoice reflects 120.75 hours of labor by "senior project manager," "engineering technician 2," "CADD technician," and "resident engineer," for a total charge of $10,059.75.

¶ 10 The record also includes an April 12, 2006, letter from Thomas Nagle, project engineer for Robinson Engineering, to Matthew Fares, chief of staff, City of Chicago Heights. It states:

"Re:     Heavy Cleaning of Large Diameter Sewer

Proposal Tabulation & Recommendation

Dear Mr. Fares:

As you know we are in the process of flow monitoring the City sanitary sewage flows into the Thorn Creek Basin Sanitary District. In order to monitor the flows we have installed meters in select manholes. These meters were installed to study the effects of the Inflow and Infiltration (I and I) due to the spring rains in the Chicago Heights sewer system. The meters have sensors designed to measure depth of flow in the sewer as well as the velocity of the flow. Due to heavy silt accumulation in the sewers at three locations, the sensors have been covered with silt and cannot accurately measure the flow. Therefore it was agreed to take proposals for cleaning of the sewer in the location of the meters.

On April 11, 2006 at 2:30 PM at the City Council Chambers we received proposals for heavy cleaning of large diameter sewer. The proposals were found to be correct and in order as submitted, and are as follows:

R&R Septic & Sewer Service, Inc……………$16,170.00

Municipal Sewer Services, Inc………………...$26,401.20

National Power Rodding Corp……………**…**…$45,960.50

Therefore, we recommend that the contract be awarded to the low bidder, R&R Septic & Sewer Service, Inc. in the amount of Sixteen Thousand, One Hundred Seventy Dollars and Zero Cents ($16,170.00)."

¶ 11 As noted, prior to the flood, the City contracted with Robinson Engineering to install several flow monitors throughout the City's sanitary sewer. Those monitors recorded the amount and velocity of flow traveling within the City's sewer during the rainstorm at issue here. In 2007, Robinson Engineering submitted the results of this monitoring to the City in a written report, which is included in the record on appeal. According to the report, prior to the flood, the City was "experiencing serious sanitary sewer transport problems," including excessive silt and debris buildup within the sewers, and inflow and infiltration problems.

¶ 12 Plaintiffs' expert, Rick Arbour, opined that the flooding experienced by the plaintiffs could have been avoided if the City had done appropriate preventative maintenance of the sewer system. Arbour's affidavit, included in the record on appeal, states in pertinent part, that he has "over 49 years of Operation and Maintenance (O&M) experience, all of which is directly or indirectly related to Sanitary Sewer Systems," and that he was hired by plaintiffs to offer an opinion as to the flooding of their homes. Arbour explained that the City's sanitary sewer is a separated system, meaning that sanitary sewage is discharged into a system separate from the storm water system. He explained that excessive rain water is not supposed to enter or affect a sewer system like Chicago Heights "unless the sewer system has a problem with inflow and infiltration; which clearly the City does." He further explained:

"9. Inflow and infiltration are terms used to denote two types of clear water that can make their way into a sewer system. Inflow enters the sanitary sewer system from sump pumps, area/footing drains, roof leaders, manholes or other connections to the sewer system. Infiltration, or ground water, enters the sewer system from defects in the system's main line and the private lateral lines owned by individual residents.

10. Any defect in a sewer, for example, pipe sags, offset joints, protruding taps, cracks, debris, or root intrusion or pipe installed at less than the recommended slope can cause debris to pile up and slow the flow of sewage, or in the case of a blockage, stop the flow of water in the pipe, completely. A stoppage of this nature will cause the flow to 'back-up' or surcharge the pipe upstream of the blockage. Further, any time there is a crack or a break in the pipe, this leads to excessive infiltration of groundwater into the sanitary sewer. This will result in the surcharging to occur at a higher rate."

¶ 13 He went on to opine that the City knew there was a problem with inflow and infiltration, but did not fix it, and generally failed to adequately maintain its system. As a result, the hydraulic conveyance capacity was reduced.

¶ 14 Arbour attested:

"16. This failure to perform any needed maintenance added to the system's preexisting problems and most definitely played a significant role in the Plaintiffs' basement flooding. The inescapable conclusion is that the City knew, in the event of a rain storm, that its system would be inundated with clear water which would overburden the system and likely cause a backup into homeowner's basements. The City was well aware of these conditions prior to the flooding of Plaintiffs' homes and yet it did nothing to remedy the situation."

¶ 15 Arbour opined:

"7. Based upon the evidence that I have reviewed, it is my professional opinion that the flooding of the Plaintiffs' homes on April 16-17, 2006 was caused by excessive inflow and infiltration compounded by accumulated debris in the line which reduced the hydraulic conveyance capacity of the system. More specifically, the flooding occurred due to:

a. the insufficient capacity in the sewer system caused by excessive inflow and infiltration that consumed capacity intended to [convey] wastewater and,

b. a lack of preventative maintenance that allowed system wide defects to develop in the sewer that severely reduced the hydraulic capacity of the Defendant's sanitary sewer system."

¶ 16 The City moved for summary judgment on plaintiffs' claims, arguing that the protections afforded the City by the Tort Immunity Act rendered the City immune from plaintiffs' claims, and because plaintiffs' negligence claims under the theory of *res ipsa loquitur* failed where indisputable facts established that the city was not in exclusive control over the instrumentalities that allegedly resulted in the flooding suffered by plaintiffs. The City argued that it was immune from plaintiffs' claims pursuant to section 2-201 of the Tort Immunity Act. In support of this contention, it argued for immunity because the decisions regarding the maintenance and operation of the Chicago Heights sewer system "were unique to the office of the City of Chicago Heights City Council" and the "City Council alone had the authority and discretion to make decisions related to the allocation of funds, balancing the priorities of sewage maintenance against that [of] the rest of the Chicago Heights infrastructure." It argued that the city council of the City of Chicago Heights had the sole discretionary authority to provide for the maintenance, repair, and operation of the City's sewer and water systems, that there was no prescribed manner in which the City was to act in the maintenance, repair, and operation of its sewer and water systems, and that the City deliberated as to what maintenance and upgrades to its sewer system were advisable in light of budgetary and other concerns. Some of these deliberations took place in the weeks just prior to the April 16-17 rainfall.

¶ 17 The City also contended it did, in fact, take action to maintain, repair, and upgrade the sewer system prior to April 2006. One particular area in which the City took action prior to April 2006 was work meant to eliminate inflow and infiltration into the sewer systems, a problem largely caused by illegal connections to the system by Chicago Heights residents.

¶ 18 The City also argued that summary judgment was proper regarding the claim of negligence under the theory of *res ipsa loquitur* because plaintiffs could not prove the City had exclusive control over the instrumentalities that allegedly caused the injuries suffered as a result of the flooding.

¶ 19 After hearing arguments, the trial court granted the City's motion for summary judgment, specifically ruling that plaintiffs' claims were barred by discretionary immunity, and finding the City was making decisions based upon what it could afford. The court stated:

"THE COURT: *** [T]he way that I see this, it is discretion that these people don't hire ten guys to go clean the sewers once a month and it is discretion that they don't take out a $10 million loan and redo all the sewer lines and it is discretion also that they don't hire an outside contractor to go through with vactor trucks and clean every manhole and every sewer."

The trial court further held that there was no genuine issue of material fact that the City did not have sufficient control over the sewer system where "there's all kind of entries and intrusions

into this sewer line that would allow somebody even remotely taking some action that could have caused the sewer to overflow." The court granted the motion for summary judgment as to the count alleging negligence under the doctrine of *res ipsa loquitur*.

¶ 20    In addition, the trial court denied plaintiffs' motion to strike the Sabo affidavit because Sabo, as an alderman between 1999 and 2007, and the director of city services from 2007 to 2009, could "speak to his firsthand knowledge and memory with the specific ordinances or resolutions" and could speak to what the mayor's awareness was because "they're at City Council meetings and he's there and he's able to say in a broad sense what was going on and certainly from the paper and the documents that are flying around here, I think everybody in town knew what's going on with respect to the sewer problems."

¶ 21    Plaintiffs appeal the grant of summary judgment.

¶ 22                              II. ANALYSIS
¶ 23                         A. Governmental Immunity
¶ 24    Plaintiffs first contend the trial court erred in granting summary judgment where the City is not entitled to discretionary immunity under the Act. Specifically, plaintiffs argue that their claims arose from the City's ministerial–not discretionary–act of failing to maintain its sewer system. We disagree.

¶ 25    At the summary judgment stage, a plaintiff is not required to prove its case. See *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423 (1998). That is, the purpose of summary judgment is not to try a question of fact, but only to determine whether one exists. See *Jackson*, 185 Ill. 2d at 423. Thus, summary judgment is proper only when the pleadings, affidavits, depositions, and admissions of record, construed strictly against the moving party, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001); 735 ILCS 5/2-1005 (West 2010). This relief is an appropriate tool to employ in the expeditious disposition of a lawsuit in which " 'the right of the moving party is clear and free from doubt.' " *Morris*, 197 Ill. 2d at 35 (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)). Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law. *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 670 (1992). A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010); see also *In re Estate of Ciesiolkiewicz*, 243 Ill. App. 3d 506, 510 (1993). When determining whether a genuine issue of material fact exists, courts construe the pleadings liberally in favor of the nonmoving party. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "Summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, but as a drastic measure it should be allowed only when a moving party's right to it is clear and free from doubt." *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). We review summary judgment rulings *de novo* (*Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995)), and we will only disturb the decision of the trial court where we find that a genuine issue of material fact exists. *Addison v. Whittenberg*, 124 Ill. 2d 287, 294 (1988). In our review, we may affirm on any basis found in the record regardless of whether the trial court relied on those grounds or whether its reasoning was correct. *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App.

3d 156, 163 (2004); see also *Pepper Construction Co. v. Transcontinental Insurance Co.*, 285 Ill. App. 3d 573, 576 (1996).

¶ 26     The Tort Immunity Act recognizes that local governmental units are liable in tort, but limits this liability with a list of immunities based on specific government functions. See *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 341 (1998). Governmental entities bear the burden of properly raising and proving that they are immune under the Act in order to bar plaintiffs' recovery. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 370 (2003). The purpose of the Tort Immunity Act is "to protect local public entities and public employees from liability resulting from the operation of government." *Ware v. City of Chicago*, 375 Ill. App. 3d 574, 577-78 (2007).

¶ 27     Section 2-201 of the Act provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (West 2008); *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 193-94 (1997). Our supreme court has defined the terms "discretionary" and "ministerial" as follows:

> " '[D]iscretionary acts are those which are unique to a particular public office, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act.' " (Emphases omitted.) *Van Meter*, 207 Ill. 2d at 371-72 (quoting *Snyder v. Curran Township*, 167 Ill. 2d 466, 474 (1995)).

¶ 28     Section 2-201 immunity protects against both negligent and willful and wanton conduct. *Chicago Flood Litigation*, 176 Ill. 2d at 195-96. Section 2-209 of the Act allows municipalities to shelter under the immunity granted to public employees covered by immunity pursuant to section 2-201:

> "A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2008).

¶ 29     For immunity to apply, a defendant's act or omission must be both "the determination of policy" and "the exercise of discretion." *Harinek*, 181 Ill. 2d at 341. Policy determinations involve " 'those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Harinek*, 181 Ill. 2d at 342 (quoting *West v. Kirkham*, 147 Ill. 2d 1, 11 (1992)).

¶ 30     Our supreme court has recognized that "the distinction between discretionary and ministerial functions resists precise formulation, and that the determination whether acts are discretionary or ministerial must be made on a case-by-case basis." *Snyder*, 167 Ill. 2d at 474.

¶ 31     Whether a municipality engages in a program of public improvement is a discretionary matter, but the manner in which the municipality implements the program is ministerial. *Snyder*, 167 Ill. 2d at 474. Our supreme court explored the concept of discretionary versus ministerial acts in *Chicago Flood Litigation:*

> " 'Official action is judicial where it is the result of judgment or discretion. Official duty is ministerial, when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion. [Citation.] A [municipal] corporation acts judicially, or

exercises discretion, when it selects and adopts a plan in the making of public improvements, such as constructing sewers or drains; but as soon as it begins to carry out [the] plan, it acts ministerially, and is bound to see that the work is done in a reasonably safe and skillful manner.' " *Chicago Flood Litigation*, 176 Ill. 2d at 194 (quoting *City of Chicago v. Seben*, 165 Ill. 371, 378 (1897)).

¶ 32    Where an official's conduct requires deliberation or the exercise of judgment, his or her actions are discretionary and not ministerial in nature. *Donovan v. County of Lake*, 2011 IL App (2d) 100390, ¶ 62.

¶ 33    In the case at bar, plaintiffs are unable to point to a particular act or omission that this Court can analyze to determine whether it was ministerial or discretionary. Instead, plaintiffs ask this court to determine that the City's conduct as a whole in regard to the maintenance and upkeep of its sewer systems prior to the occurrence period was ministerial. We reject this reasoning, as the record on appeal supports the conclusion that the City was acting in its discretionary function. Therefore, we find the trial court properly ruled that the City is immune from plaintiffs' claims of negligence where the decisions the City made regarding the maintenance and improvement of its sewer system were discretionary in nature.

¶ 34    The letters from the mayor, in particular, evidence that the City had a plan which it was implementing. For example, the mayor's March 2006 letter, dated a full month before the rainstorm and subsequent flooding at issue here, included a plan that "serve[d] as an expansion of [the City's] current [sewer] rehabilitation program by outlining tasks and budget assignments designed to bring the [sewer] system into compliance." It included "system investigations and systematic rehabilitation designed to remove, isolate and pinpoint Inflow/Infiltration (I/I) sources throughout the City's sanitary sewer transport system." It then outlined the actions the City had already taken, including an authorization of over $1,100,000 in private sector and public sector investigations to isolate and identify sources of infiltration and inflow into the sanitary sewer system; performance of over $1 million in rehabilitation work since 1997, noting that as "part of our initial phase of sewer rehabilitation, the City (funded by a $3.2 million low interest loan from the Illinois Environmental Protection Agency), completed several sewer improvements on the City's northwest side in 1997." It also noted that it continues to retire the sewer improvement debt at a rate of $220,000 per year. By that letter, the mayor then outlined specific sewer projects the City had completed since 1994, resulting in "over $1,100,000 in public sector rehabilitation repairs to reduce infiltration and inflow into its sanitary sewer system." He noted the work "greatly reduced" inflow and infiltration entering the sanitary sewer system.

¶ 35    Additionally, the mayor's September 2005 letter also evidenced a plan to improve the City's sewer systems. That letter also outlined work that had been completed on the sewer, including dye water flood testing of 137 "high priority" locations. The mayor noted that manhole rehabilitation is "generally found to be cost-effective due to the relatively low repair cost and significant I/I reductions achieved," and then proposed a 14-year plan to rehabilitate the City's manholes, as well as work on sewer lining, flow monitoring, and sewer televising.

¶ 36    In addition, the record includes proof of work being completed on the City's sewers prior to the April 2006 rainstorm, as evidenced by the March 2006 invoice from Robinson Engineering for "services performed," including "perform flow monitoring, prepare proposal for sewer cleaning, review sewer cleaning proposals, meeting with Chicago Heights staff and TCBSD." The April 12, 2006, Robinson Engineering letter shows that it had installed meters in

select manholes in order to monitor flow and study the effects of the inflow infiltration into the sewer system, and found that the sensors on the monitors were subsequently covered with silt and unable to accurately measure the flow. The letter then described the proposals taken for "heavy cleaning of large diameter sewer" that were received at the city council chambers, and recommended a contract be awarded for the work to be completed.

¶ 37 All of this supports our conclusion that the City was acting in its discretionary capacity, that is, acting in a manner requiring deliberation and the exercise of judgment, rather than merely executing a set task. See, *e.g.*, *Donovan*, 2011 IL App (2d) 100390, ¶ 62 (where an official's conduct requires deliberation or the exercise of judgment, his or her actions are discretionary and not ministerial in nature); see also *Chicago Flood Litigation*, 176 Ill. 2d at 194 ("Official action is judicial where it is the result of judgment or discretion. Official duty is ministerial, when it is absolute, certain and imperative, involving merely the execution of a set task, and when the law which imposes it, prescribes and defines the time, mode and occasion of its performance with such certainty, that nothing remains for judgment or discretion." (Internal quotation marks omitted.)).

¶ 38 Moreover, the mayor's September 2005 letter describing how, "[a]fter the compliance schedule is agreed upon we subdivide the plans to meet the financial constraints of the yearly budget" shows the mayor and the city council were trying to stretch the City's dollars and use the City's resources to fix the problem, recognizing the problem existed and attempting to find a solution within its budgetary constraints. That fits precisely within the definition of a policy determination under the Tort Immunity Act, that is, " 'those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests.' " *Harinek*, 181 Ill. 2d at 342 (quoting *West*, 147 Ill. 2d at 11). Also consistent with making a policy determination is the following passage from the mayor's March 6, 2006, letter to a local sanitary district official:

> "The rehabilitation of all defects found in the entire system is almost never cost-effective. In any system, however, some rehabilitation is always cost-effective. The system costs for most sewage collection and treatment systems of any significant size depend upon its capacity, or the flow it can handle. The desirable extent of rehabilitation can only be determined objectively by economic and practical considerations. We are committed to the rehabilitation program ***."

¶ 39 Again, this letter, dated just weeks before the rainstorm at issue here, demonstrates that the mayor and the City were balancing competing interests and making continued and ongoing judgment calls as to what set of action would best serve those competing interests. See *Harinek*, 181 Ill. 2d at 342.

¶ 40 Plaintiffs' argument that tort immunity should not apply in this case because the City's "method of operating the sewers" violated Illinois Environmental Protection Agency (IEPA) regulations is unavailing. In *Donovan*, the Second District upheld the trial court's dismissal of a class plaintiffs' negligence claim against the county because the government defendant was immune from liability pursuant to the Tort Immunity Act. The *Donovan* plaintiffs alleged that the county was obligated by the IEPA to chlorinate the water system's groundwater and that, because the county failed to do so, excessive amounts of bacteria were detected on various occasions. *Donovan*, 2011 IL App (2d) 100390, ¶ 7. The plaintiffs claimed, in pertinent part, that the county was mandated by law to provide water of safe quality, and was obligated to chlorinate the groundwater it distributed to the plaintiffs and their neighbors. *Donovan*, 2011

IL App (2d) 100390, ¶ 20. The trial court dismissed the claims, finding the county immune from the suit. *Donovan*, 2011 IL App (2d) 100390, ¶ 59. The plaintiffs appealed, arguing that the county was not immune because some of the duties it allegedly breached were ministerial rather than discretionary. *Donovan*, 2011 IL App (2d) 100390, ¶ 59. The appellate court rejected this claim, finding:

> "Here, although the County may have been legally mandated to chlorinate the water and to provide safe drinking water, our focus is on the *manner* in which the County carried out, or failed to carry out, those duties. For example, as to plaintiffs' factual allegations relating to three IEPA reports of coliform violations between 2000 and 2005, each required the County to decide the appropriate means and method to repair the violation, *i.e.*, whether to install chlorination facilities on the existing site or to completely rebuild the water system, as well as how to fund the repair. Further, the majority of the allegations in the amended complaint relate to the required replacement of the water system and whether customers should bear the entire cost. Those allegations relate to how to replace a more-than-50-year-old water system and invoke discretionary decisions on the part of the County. See *In re Chicago Flood Litigation*, 176 Ill. 2d at 194 (a municipal corporation acts judicially, or exercises its discretion, when it selects and adopts a plan in the making of public improvements). Accordingly, we find that the County met its burden of establishing that count I should have been barred because the County was shielded from liability under section 2-201 of the Tort Immunity Act." (Emphasis in original.) *Donovan*, 2011 IL App (2d) 100390, ¶ 62.

Similarly, here, the City's decisions, even if they were in violation of IEPA regulations, are considered discretionary and are shielded from liability under section 2-201 of the Tort Immunity Act.

¶ 41   We understand plaintiffs' frustration that their homes were flooded with waste and we, like the trial court below, recognize that this flooding may have been avoided had the City's sewers been better maintained. However, a municipality must function while balancing many interests, including a limited budget. Here, the City had a plan and was moving forward on that plan, balancing, as a municipality must, many interests. Even if its conduct were negligent, we would still find that it was immune from suit under section 2-201. See *Chicago Flood Litigation*, 176 Ill. 2d at 195-96. We find no error in the grant of summary judgment on Count II in favor of the City where the City is subject to immunity under the Tort Immunity Act.

¶ 42                            B. *Res Ipsa Loquitur*

¶ 43   Next, plaintiffs contend the trial court erred in granting summary judgment in the City's favor on count I, *res ipsa loquitur* negligence. Specifically, plaintiffs argue that the evidence shows the flooding of the plaintiffs' basements "could not have occurred without an act of negligence by the City" and, therefore, summary judgment is in error. Plaintiffs claim the City was negligent in both its maintenance and operation of the sanitary sewer. We disagree.

¶ 44   To establish their claim for negligence, plaintiffs were required to allege facts establishing defendant owed them a duty of care, defendant breached the duty of care, and the alleged breach proximately caused plaintiffs' injuries. *Swain v. City of Chicago*, 2014 IL App (1st) 122769, ¶ 14. "The mere happening of an accident does not entitle a plaintiff to recover. A plaintiff must come forward with evidence of negligence on the part of the defendant and with evidence that the defendant's negligence was a proximate cause of the plaintiff's injuries.

Proximate cause can only be established when there is a *reasonable certainty* that the defendant's acts caused the injury." (Emphasis in original.) *Payne v. Mroz*, 259 Ill. App. 3d 399, 403 (1994). Proximate cause may not be based on "mere speculation, guess, surmise or conjecture." *Castro v. Brown's Chicken & Pasta, Inc.*, 314 Ill. App. 3d 542, 553 (2000). Generally, the issue of cause is a question of fact for the jury, but the lack of proximate cause may be determined by the court as a matter of law where the facts alleged failed to sufficiently demonstrate both cause in fact and legal cause. *Vertin v. Mau*, 2014 IL App (3d) 130246, ¶ 10.

¶ 45        "The doctrine of *res ipsa loquitur* requires that (1) the occurrence is one that ordinarily does not occur in the absence of negligence; and (2) the defendant had exclusive control of the instrumentality that caused the injury." *Britton v. University of Chicago Hospitals*, 382 Ill. App. 3d 1009, 1011 (2008). The Third District has explained the doctrine thus:

> "*Res ipsa loquitur* involves a species of circumstantial evidence permitting the trier of fact to draw an inference of negligence [citation]; the doctrine permits circumstantial evidence as proof of negligence where direct evidence is primarily within the control of the defendant [citation]. Once properly invoked, the doctrine operates to shift the burden of going forward with the evidence to the defendant, though any presumption of negligence may then be rebutted by the defendant. [Citations.]" *Taylor v. City of Beardstown*, 142 Ill. App. 3d 584, 592 (1986).

¶ 46        The requisite control element of *res ipsa loquitur* is not a rigid standard, but instead is a flexible one in which the key question is whether the probable cause of the plaintiff's injury was a cause that the defendant had a duty to the plaintiff to anticipate or guard against. *Heastie v. Roberts*, 226 Ill. 2d 515, 532 (2007). It is enough that the defendant has the right or power of control as well as the opportunity to exercise that right, or that he is under a duty that he cannot delegate. *Lynch v. Precision Machine Shop, Ltd.*, 93 Ill. 2d 266, 273 (1982). Nonetheless, it must be shown that the plaintiff's injury can be traced to a specific instrumentality or cause for which the defendant was responsible or that he was responsible for all reasonable causes to which the incident could be attributed. *Raleigh v. Alcon Laboratories, Inc.*, 403 Ill. App. 3d 863, 869 (2010) (quoting *Napoli v. Hinsdale Hospital*, 213 Ill. App. 3d 382, 388 (1991)). Thus, the defendant's responsibility for a specific cause of an event is proven by eliminating the *responsibility* of any other person for that cause. *Lynch*, 93 Ill. 2d at 273. A plaintiff is not required, however, to eliminate all other possible *causes* for the injury. *Gatlin v. Ruder*, 137 Ill. 2d 284, 299 (1990). Additionally, the inference may be drawn where the defendant shares control with another individual. *Lynch*, 93 Ill. 2d at 273; see also *Loizzo v. St. Francis Hospital*, 121 Ill. App. 3d 172, 179-80 (1984) (in medical malpractice action, *res ipsa loquitur* does not apply where negligence may be attributed to one of several individuals and no principle renders them liable *in solido* or where the injury may have been caused by a person who was not a joint actor or was not in control of an injured patient). Furthermore, where *res ipsa loquitur* is to be applied, all parties who could have caused the plaintiff's injuries are joined as defendants. *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 257 (1990).

¶ 47        Initially, we note we have already determined herein that, even if the City were negligent in its maintenance of the sewer, we would still find it was immune from suit under section 2-201 of the Tort Immunity Act. See *Chicago Flood Litigation*, 176 Ill. 2d at 195-96. Regardless, even beyond the issue of immunity, we also find the city is not guilty of negligence pursuant to the doctrine of *res ipsa loquitur* where the City simply did not have sufficient control of the sewer system.

- 17 -

¶ 48    Plaintiff's expert, Rick Arbour, listed numerous ways clear water could enter the sewer system, slowing the system or overwhelming its hydraulic capacity. For instance, he noted that inflow could enter the sanitary sewer system from "sump pumps, area/footing drains, roof leaders, manholes or other connections to the sewer system." Infiltration, or ground water, can enter the sewer system from "defects in the system's main line and the private lateral lines owned by individual residents." He further explained that "[a]ny defect in a sewer, for example, pipe sags, offset joints, protruding taps, cracks, debris, or root intrusion or pipe installed at less than the recommended slope can cause debris to pile up and slow the flow of sewage, or in the case of a blockage, stop the flow of water in the pipe, completely. A stoppage of this nature will cause the flow to 'back-up' or surcharge the pipe upstream of the blockage. Further, any time there is a crack or a break in the pipe, this leads to excessive infiltration of groundwater into the sanitary sewer. This will result in the surcharging to occur at a higher rate." According to plaintiffs' expert, then, while the City's failure to perform maintenance "added to the system's preexisting problems" and played a "significant role" in the flooding of plaintiffs' homes, there were also many other avenues from which this water could have infiltrated the system, overwhelming the system and eventually causing the surcharge into plaintiffs' basements. We find no error in the trial court's grant of summary judgment in favor of the City on count I where plaintiffs are unable to show the City was sufficiently in control of the system for the doctrine of *res ipsa loquitur* to apply.

¶ 49                    C. The Motion to Strike the Sabo Affidavit

¶ 50    Finally, plaintiffs contend the trial court erred in denying their motion to strike the Sabo affidavit because the motion violated Illinois Supreme Court Rule 191 (eff. Jan. 4, 2013). We disagree.

¶ 51    Supreme Court Rule 191 governs the requirements of affidavits used in support of a motion for summary judgment. Rule 191 states, in pertinent part:

        "Affidavits in support of and in opposition to a motion for summary judgment under section 2-1005 of the Code of Civil Procedure *** shall be made on the personal knowledge of the affiants; shall set forth with particularity facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013).

¶ 52    A Rule 191 affidavit "is actually a substitute for testimony taken in open court and should meet the same requisites as competent testimony." *Harris Bank Hinsdale, N.A. v. Caliendo*, 235 Ill. App. 3d 1013, 1025 (1992). An affidavit that is conclusory and does not include facts upon which the affiant relies is in violation of Rule 191. *Landeros v. Equity Property & Development*, 321 Ill. App. 3d 57, 63 (2001). However, Rule 191 is satisfied if it appears, from the document as a whole, that the affidavit is based upon the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents at trial. *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 349 (2010). "It is the function of a trial court to determine the admissibility of evidence, and its rulings will not be disturbed absent an abuse of discretion." *Piser*, 405 Ill. App. 3d at 349-50.

¶ 53    In the case at bar, at the time of the hearing, Sabo had been the director of the department of street, sewer and vehicle maintenance for the City since 2009, and his experience with the City

went back much further. In his affidavit, Sabo outlines his long experience with the City, including acting as alderman on the city council from 1999 to 2007, as director of the department of city services and projects from 2007 to 2009, and as director of the department of street, sewer and vehicle maintenance from 2009 to the time he swore the affidavit. Sabo specifically averred in his affidavit that he made the affidavit "of [his] own personal knowledge."

¶ 54 Plaintiffs challenge paragraphs 11, 12, 14, 15, 17, 25, and 27 of the Sabo affidavit. Paragraph 11 provides:

> "11. Thorn Creek has the ability to regulate the amount of wastewater that flows from the City's sanitary sewer system into the Thorn Creek treatment plant."

Plaintiffs argue that this statement contradicts Sabo's deposition testimony in which he testified he did not have firsthand knowledge of the Thorn Creek treatment plant's ability to regulate wastewater intake, admitted he could not remember the memo he used to form the basis of paragraph 11, and did not attach that memo to his affidavit. Plaintiffs argue that "the affidavit fails to demonstrate that the affiant, if sworn as a witness, can testify competently to the matter."

¶ 55 Paragraph 12 of the Sabo affidavit provides:

> "12. If for any reason the flow from the City's sewer system into the Thorn Creek facility was stopped or slowed, this could cause the City's system to backup and result in backups in the homes and businesses of City residents."

Plaintiffs argue that this is speculative and violates Supreme Court Rule 191 because: 1) it is a conclusion unsupported by facts; and 2) Sabo does not have personal knowledge of the underlying facts.

¶ 56 Paragraph 14 provides:

> "14. A blockage in a City resident's lateral lines could and often does cause sewage backups into the resident's home and/or the backup of sewage into other residents' homes."

Plaintiffs argue this paragraph contains an improper conclusion and "fails to set forth with particularity the basis of the statements, consists only of the conclusions of the affiant unsupported by facts, and fails to affirmatively show that the affiant, if sworn as a witness, can testify competently to the matter."

¶ 57 Paragraph 15 of the Sabo affidavit provides:

> "15. The City Council adopted as the standard for operations and maintenance of its municipal sewer systems to have a system that can handle events involving less than a 50 year storm."

Plaintiffs argue this paragraph violates Supreme Court Rule 191 because it contains the conclusion that the standard adopted by the City was to have a sewer system that could handle events involving less than a 50-year storm, but Sabo testified in his deposition that he did not know whether the resolution at issue applied to operations and maintenance or whether it related only to design. Plaintiffs also argue that the resolution forming the basis for the opinion should have been attached to the affidavit.

¶ 58 Paragraph 17 of the Sabo affidavit provides:

> "17. The Chicago Heights City Council alone has the authority to allocate funds for and initiate a plan to maintain, repair and /or upgrade the City's sewer system."

Plaintiffs argue that paragraph 17 "contains a legal opinion regarding authority to manage the City's sewer system, and fails to set forth any facts in support of that opinion," that it fails to set forth with particularity the basis of the statements and fails to show that the affiant could competently testify to the matter.

¶ 59 Paragraph 25 of the Sabo affidavit provides:

> "25. In 2005, The City Council made the policy decision, in full cooperation with Thorn Creek, that the work required to bring the sewer system into compliance with infiltration limits would be completed in 2015."

Plaintiffs challenge paragraph 25, arguing it contains an improper conclusion unsupported by facts, and argue that the resolution at issue should have been attached to the affidavit.

¶ 60 Paragraph 27 of the Sabo affidavit provides:

> "27. The type of flooding that Plaintiffs allege they suffered in this case can occur in the homes of Chicago Heights' residents as a result of an obstruction in the sanitary sewer system despite the City's regular maintenance and inspection of the system."

Plaintiffs argue this paragraph conflicts with the requirements of Rule 191 because it contains a conclusion without supporting facts, it fails to "set forth with particularity the basis of the statements," and fails to affirmatively show that the witness could testify competently to the matter.

¶ 61 At the hearing on the motion for summary judgment, the trial court did not appear to rely on the Sabo affidavit. It ruled on the motion to strike the affidavit, however, and noted:

> "THE COURT: I heard your arguments on [the motion to strike] so I should rule on that, too, and I think I'm going to allow that affidavit to stand but I'll state some of the reasons for the record.
>
> Mr. Sabo was the Alderman between 1999 and 2007. Then after that, '07 to '09, he was Director of City Services, and he talks about the legislative enactments and ordinances. And I respect that what [plaintiffs' attorney is] saying that he doesn't attach the ordinances or these resolutions that he's referencing, but as a firsthand witness and as a person that was in the city council during the timeframe that most of the paragraphs that he's referencing, I think he can speak to his firsthand knowledge and memory without the specific ordinances or resolutions. So even those and I think he can state what maybe not the Mayor's policy was or the awareness but I think he can even say what the Mayor's awareness was. I mean they're at City Council meetings and he's there and he's able to say in a broad sense what was going on and certainly from the paper and the documents that are flying around here, I think everybody in town knew what's going on with respect to the sewer problems. So I'm going to deny the motion to strike the affidavit also."

¶ 62 Sabo was one of six aldermen for the City of Chicago Heights before, during, and after the April 2006 rainstorm. Sabo's affidavit established that, based on his service as an alderman from 1999 to 2007, he had detailed knowledge regarding the functioning of the city council and the City's maintenance and operation of its sewer system over a period of years both prior to and subsequent to the April 2006 flood at issue. His affidavit also established that he served as the director of city services and projects between 2007 and 2009, and then as the director of street, sewer, and vehicle maintenance departments for the City from 2009 forward. This experience, in combination with the facts contained in Sabo's affidavit, including his specific statement that the affidavit was based on his "own personal knowledge," are sufficient to

establish that he had personal knowledge of the facts contained in his affidavit. See, *e.g.*, *Piser*, 405 Ill. App. 3d at 349 (Rule 191 is satisfied if it appears, from the document as a whole, that the affidavit is based upon the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents at trial.). We find no abuse of discretion in the trial court's denial of plaintiffs' motion to strike.

¶ 63                                III. CONCLUSION

¶ 64        For all of the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

¶ 65        Affirmed.